**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 23-3212

In the
# United States Court of Appeals
# for the District of Columbia Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

DAVID PAITSEL,
*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 1:19-CR-00156-CKK-2

---

**PRINCIPAL BRIEF OF THE DAVID PAITSEL**

---

Linda Julin McNamara
Fla. Bar. No. 7148887
email: linda@federal-lawyer.com
Oberheiden P.C.
610 East Zack Street, Suite 110-4079
Tampa, FL 33602
Telephone: (813)784-7921

Date July 17, 2024

# Certificate as to Parties, Rulings, and Related Cases

## I.    Parties and Amici

1.    Aloi, Elizabeth Ann, Assistant United States Attorney; counsel for the United States

2.    Borchert, John Witherspoon, Assistant United States Attorney; counsel for the United States

3.    Cooney, J.P. Assistant United States Attorney; counsel for the United States

4.    Bailey, Brian; defendant

5.    Barbari, Rammy George, district court counsel for David Paitsel

6.    Benowitz, David; district court counsel for David Paitsel

7.    Brodnax III, Pleasant Sanford; district court counsel for Brian Bailey

8.    Ivey, Glenn F., district court counsel for David Paitsel

9.    Jara, Ana Lorraine; district court counsel for Brian Bailey

10.   Jenkins Jr., Robert Lee; district court counsel for David Paitsel

11.   Kropt, Sar, district court counsel for Brian Bailey

12.   Marando, Michael John, Assistant United States Attorney; counsel for the United States

13.   McNamara, Linda Julin Oberheiden P.C.; appellate counsel for David Paitsel

14.   Paitsel, David; defendant-appellant

15. Retureta, Manuel; district court counsel for Brian Bailey

16. Schamel, Mark E; district court counsel for Brian Bailey

17. Sukumar, Shawn; district court counsel for David Paitsel

## II. Rulings Under Review

1. The District Court's denial of David Paitsel's Motion for Judgment of Acquittal. *See* Docs. 264, 265.

2. The District Court's rulings on the proposed jury instructions at App'x at 87 (Doc. 201 at 2); Doc. 201-1 at 3–4, and the Court's instructions to the jury at App'x at 1356–94 (Doc. 309 at 43–81).

## III. Related Cases

None

## Statement Regarding Oral Argument

This appeal raises important issues concerning the reach of the federal bribery statute, the use of ethical standards to prove a public official's "official duty," and the use of a jury instruction that directs a verdict on an element of the offense. Because this Court has not yet addressed those issues in the context presented here, Appellant David Paitsel requests oral argument.

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases ...................................C-1

Statement Regarding Oral Argument ........................................................... i

Table of Contents.......................................................................................... ii

Table of Citations ........................................................................................ iv

Glossary ..................................................................................................... viii

Statement of Jurisdiction ............................................................................ ix

Statutes and Regulations ............................................................................. x

Statement of the Issues ................................................................................ 1

Statement of the Case................................................................................... 1

    *Course of Proceedings* ............................................................................. 1

    *Statement of the Facts*.............................................................................. 3

    *Standard of Review*.................................................................................. 26

Summary of the Argument ........................................................................ 27

Argument and Citations of Authority........................................................ 29

    I.    The Government Failed to Present Sufficient Evidence Supporting
        the Jury's Verdicts.................................................................... 29

    II.    The District Court's Structural Error in the Bribery Instruction
        Jury Led the Jury to Convict Paitsel Based on Conduct that did
        not Constitute Bribery or Conspiracy to Commit Bribery........... 47

Conclusion ................................................................................................. 56

Certificate of Compliance with Type-Volume Limitation............................ 57

Certificate of Service ........................................................................ 58

# Table of Citations

## Cases

*Arthur v. United States*, 986 A.2d 398 (D.C. 2009) ......................................... 53

*Baker v. United States*, 324 A.2d 194, 196–97 (D.C. 1974) ............................. 55

*Barrows v. United States*, 15 A.3d 673 (D.C. 2011) ........................................ 54

*Connecticut v. Johnson*, 460 U.S. 73 (1983) ................................................... 48

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993) ............ 27

*Neder v. United States*, 527 U.S. 1 (1999) ...................................................... 52

*Payne v. Stansberry*, 760 F.3d 10 (D.C. Cir. 2014)............................... 27, 53, 54

*Rose v. Clark*, 478 U.S. 570 (1986); ........................................................48, 49

*Snyder v. United States*, No. 23-108, 2024 U.S. LEXIS 2843, *11 (U.S. June 26, 2024) ....................................................................................30, 31, 33, 34

*Sullivan v. Louisiana*, 508 U.S. 275 (1993)................................................50, 53

*United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002)....................................32, 38

*United States v. Bagby*, 451 F.2d 920 (9th Cir. 1971) ....................................... 52

*United States v. Bass*, 784 F.2d 1282 (5th Cir. 1986) ....................................... 49

*United States v. Bryant*, 523 F.3d 349 (D.C. Cir. 2008).................................... 27

*United States v. Burton*, 737 F.2d 439 (5th Cir. 1984) ..................................... 49

*United States v. Daily*, 921 F.2d 994 (10th Cir. 1990) ...................................... 49

*United States v. DiRico,* 78 F.3d 732 (1st Cir 1996)............................... 48, 49, 50

*United States v. Eiland*, 738 F.3d 338 (D.C. Cir. 2013) ...................................... 26

*United States v. Fernandez*, Nos. 19-15044, 19-151652022, 2022 Lexis 23350 (11th Cir. 2022) (unpublished)................................................................37, 47

*United States v. Gaudin*, 515 U.S. 506 (1995) .................................................. 48

*United States v. Hall*, 610 F.3d 727 (D.C. Cir. 2010) ...................................... 54

*United States v. Heffler*, 402 F.2d 924 (3rd Cir. 1968)...................................... 37

*United States v. Johnson*, 718 F.2d 1317, 1320 (5th Cir. 1983) (en banc) .......... 48

*United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988).............................. 49

*United States v. Labovitz*, 251 F.2d 393 (3rd Cir. 1958) ............................36, 37

*United States v. Lasanta*, 978 F.2d 1300 (2d Cir. 1992) .................................. 50

*United States v. Lefkowitz*, 284 F.2d 310 (2d Cir. 1960).................................. 52

*United States v. Luna*, 649 F.3d 91 (1st Cir. 2011) .......................................... 47

*United States v. Merlos*, 8 F.3d 48   (D.C. Cir. 1993...................................53, 54

*United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975) .................................. 41

*United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979) ...........................36, 46

*United States v. Olano*, 507 U.S. 725, 732–36 (1993) ...................................... 53

*United States v. Project on Gov't Oversight*, 616 F.3d 544 (D.C. Cir. 2010) ......... 48

*United States v. Ragsdale*, 438 F.2d 21 (5th Cir. 1971) .................................... 48

*United States v. Rockwell*, 781 F.2d 985 (3d Cir. 1986).................................... 49

*United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008) ...........................41–44

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) ................ 31, 40–41

*United States v. Valle*, 538 F.3d 341 (5th Cir. 2008) ................................ 37, 50

*United States v. Veras de los Santos*, 184 F. App'x 245, 255 (3rd Cir. 2006) ....... 37

*United States v. Wansley*, 993 F.3d 519 (7th Cir. 2021) ................................ 37

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) ................................ 26

*Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) ............................... 36

**Statutes and Regulations**

18 U.S.C. § 201 ........................... x, 2, 3, 30–35, 37–39, 41, 44, 46, 47, 50, 56

18 U.S.C. § 351 .......................................................................... 37

18 U.S.C. § 371 .................................................................... 2, 3, 47

18 U.S.C. § 1001 ....................................................................... 42–44

18 U.S.C. § 3053 ........................................................................ 37

18 U.S.C. § 3231 ........................................................................ ix

28 U.S.C. § 533 ......................................................................... 37

28 U.S.C. § 540 ......................................................................... 37

28 U.S.C. § 540A0 ...................................................................... 37

28 U.S.C. § 540B ....................................................................... 37

28 U.S.C. § 1291 ........................................................................ ix

5 C.F.R. § 2635.101 ............................................................... xvii, 2, 43, 44

5 C.F.R. § 2635.106 ......................................................................xx, 44

5 C.F.R. § 2635.702 .......................................................................xi, 2, 14

5 C.F.R. § 2635.703 .......................................................................xv, 2, 15

5 C.F.R. § 2635.704 .......................................................................xvi, 2, 15

5 C.F.R. § 3801.105 ............................................................................. 15

28 C.F.R. § 0.85 .................................................................................. 37

28 C.F.R § 45.4..........................................................................xx, 44

# Glossary

"DHCD"        District of Columbia Department of Housing and
              Community Development


"MLS"         Multiple Listing Service


"TOPA"        Tenants Opportunity to Purchase Act

## Statement of Jurisdiction

This is defendant David Paitsel's appeal from a final judgment of the United States District Court for the District of Columbia in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered judgment against Paitsel on October 25, 2023, App'x 951–58 (Doc. 300), and he timely filed a notice of appeal on November 2, 2023, Doc. 304. *See* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

# Statutes and Regulations

## 18 U.S.C. § 201   Bribery of public officials and witnesses

(a)     For the purpose of this section—

    (1)     the term "public official" means … employee or person acting for or on behalf of … any department, agency or branch of Government … under or by authority of any such department, agency … juror;

    ….

    (3)     the term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit;

….

(b) Whoever—

    (1)     directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—

        ….

        (C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person;

    (2)     being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of

value personally or for any other person or entity, in return for:

....

(C) being induced to do or omit to do any act in violation of the official duty of such official or person;

....

shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

.... .

## 5 C.F.R. § 2635.702

An employee shall not use his public office for his own private gain, for the endorsement of any product, service or enterprise, or for the private gain of friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity, including nonprofit organizations of which the employee is an officer or member, and persons with whom the employee has or seeks employment or business relations. The specific prohibitions set forth in paragraphs (a) through (d) of this section apply this general standard, but are not intended to be exclusive or to limit the application of this section.

(a)     Inducement or coercion of benefits.   An employee shall not use or permit the use of his Government position or title or any authority associated with his public office in a manner that is intended to coerce or induce another person, including a subordinate, to provide any benefit, financial or otherwise, to himself or to friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity.

Example 1:

Offering to pursue a relative's consumer complaint over a household appliance, an employee of the Securities and Exchange Commission called the general counsel of the manufacturer and, in the course of discussing the problem, stated that he worked at the SEC and was responsible for reviewing the company's filings. The employee violated the prohibition against use of public office for private gain by invoking his official authority in an attempt to influence action to benefit his relative.

Example 2:

An employee of the Department of Commerce was asked by a friend to determine why his firm's export license had not yet been granted by another office within the Department of Commerce. At a department-level staff meeting, the employee raised as a matter for official inquiry the delay in approval of the particular license and asked that the particular license be expedited. The official used her public office in an attempt to benefit her friend and, in acting as her friend's agent for the purpose of pursuing the export license with the Department of Commerce, may also have violated 18 U.S.C. 205.

(b)     Appearance of governmental sanction.   Except as otherwise provided in this part, an employee shall not use or permit the use of his Government position or title or any authority associated with his public office in a manner that could reasonably be construed to imply that his agency or the Government sanctions or endorses his personal activities or those of another. When teaching, speaking, or writing in a personal capacity, he may refer to his official title or position only as permitted by § 2635.807(b). He may sign a letter of recommendation using his official title only in response to a request for an employment recommendation or character reference based upon personal knowledge of the ability or character of an individual with whom he has dealt in the course of Federal employment or whom he is recommending for Federal employment.

Example 1:

An employee of the Department of the Treasury who is asked to provide a letter of recommendation for a former subordinate on his staff may provide the recommendation using official stationery and may sign the letter using his official title. If, however, the request is for the recommendation of a personal friend with whom he has not dealt in the Government, the employee should not use official stationery or sign the letter of recommendation using his official title, unless the recommendation is for Federal employment. In writing the letter of recommendation for his personal friend, it may be appropriate for the employee to refer to his official position in the body of the letter.

(c)    Endorsements.   An employee shall not use or permit the use of his Government position or title or any authority associated with his public office to endorse any product, service or enterprise except:

(1)    In furtherance of statutory authority to promote products, services or enterprises; or

(2)    As a result of documentation of compliance with agency requirements or standards or as the result of recognition for achievement given under an agency program of recognition for accomplishment in support of the agency's mission.

Example 1:

A Commissioner of the Consumer Product Safety Commission may not appear in a television commercial in which she endorses an electrical appliance produced by her former employer, stating that it has been found by the CPSC to be safe for residential use.

Example 2:

A Foreign Commercial Service officer from the Department of Commerce is asked by a United States telecommunications company to meet with representatives of the Government of Spain, which is in the process of procuring telecommunications services and equipment. The company is bidding against five European companies and the statutory mission of the Department of Commerce includes assisting the export activities of U.S. companies. As part of his official duties, the Foreign Commercial Service officer may meet with Spanish officials and explain the advantages of procurement from the United States company.

Example 3:

The Administrator of the Environmental Protection Agency may sign a letter to an oil company indicating that its refining operations are in compliance with Federal air quality standards even though he knows that the company has routinely displayed letters of this type in television commercials portraying it as a "trustee of the environment for future generations."

Example 4:

An Assistant Attorney General may not use his official title or refer to his Government position in a book jacket endorsement of a novel about organized crime written by an author whose work he admires. Nor may he do so in a book review published in a newspaper.

(d)     Performance of official duties affecting a private interest. To ensure that the performance of his official duties does not give rise to an appearance of use of public office for private gain or of giving preferential treatment, an employee whose duties would affect the financial interests of a friend, relative or person with whom he is affiliated in a nongovernmental capacity shall comply with any applicable requirements of § 2635.502.

(e) Use of terms of address and ranks. Nothing in this section prohibits an employee who is ordinarily addressed using a general term of address, such as "The Honorable", or a rank, such as a military or ambassadorial rank, from using that term of address or rank in connection with a personal activity.

# 5 C.F.R. § 2635.703

(a) Prohibition. An employee shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure.

(b) Definition of nonpublic information. For purposes of this section, nonpublic information is information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the general public. It includes information that he knows or reasonably should know:

(1) Is routinely exempt from disclosure under 5 U.S.C. 552 or otherwise protected from disclosure by statute, Executive order or regulation;

(2) Is designated as confidential by an agency; or

(3) Has not actually been disseminated to the general public and is not authorized to be made available to the public on request.

Example 1: A Navy employee learns in the course of her duties that a small corporation will be awarded a Navy contract for electrical test equipment. She may not take any action to purchase stock in the corporation or its suppliers and she may not advise friends or relatives to do so until after public announcement of the award. Such actions could violate Federal securities statutes as well as this section. Example 2:A General Services Administration employee involved in evaluating proposals for a construction contract cannot disclose the terms of a competing proposal to a friend

employed by a company bidding on the work. Prior to award of the contract, bid or proposal information is nonpublic information specifically protected by 41 U.S.C. 423. Example 3:An employee is a member of a source selection team assigned to review the proposals submitted by several companies in response to an Army solicitation for spare parts. As a member of the evaluation team, the employee has access to proprietary information regarding the production methods of Alpha Corporation, one of the competitors. He may not use that information to assist Beta Company in drafting a proposal to compete for a Navy spare parts contract. The Federal Acquisition Regulation in 48 CFR parts 3, 14 and 15 restricts the release of information related to procurements and other contractor information that must be protected under 18 U.S.C. 1905 and 41 U.S.C. 423. Example 4:An employee of the Nuclear Regulatory Commission inadvertently includes a document that is exempt from disclosure with a group of documents released in response to a Freedom of Information Act request. Regardless of whether the document is used improperly, the employee's disclosure does not violate this section because it was not a knowing unauthorized disclosure made for the purpose of furthering a private interest. Example 5:An employee of the Army Corps of Engineers is actively involved in the activities of an organization whose goals relate to protection of the environment. The employee may not, other than as permitted by agency procedures, give the organization or a newspaper reporter nonpublic information about long-range plans to build a particular dam.

**5 C.F.R. § 2635.704**

(a)     Standard. An employee has a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes.

(b)     Definitions. For purposes of this section:

(1)     Government property includes any form of real or personal property in which the Government has an ownership, leasehold,

or other property interest as well as any right or other intangible interest that is purchased with Government funds, including the services of contractor personnel. The term includes office supplies, telephone and other telecommunications equipment and services, the Government mails, automated data processing capabilities, printing and reproduction facilities, Government records, and Government vehicles.

(2)    Authorized purposes are those purposes for which Government property is made available to members of the public or those purposes authorized in accordance with law or regulation.

Example 1:

Under regulations of the General Services Administration at 41 CFR 101–35.201, an employee may make a personal long distance call charged to her personal calling card.

Example 2:

An employee of the Commodity Futures Trading Commission whose office computer gives him access to a commercial service providing information for investors may not use that service for personal investment research.

Example 3:

In accordance with Office of Personnel Management regulations at part 251 of this title, an attorney employed by the Department of Justice may be permitted to use her office word processor and agency photocopy equipment to prepare a paper to be presented at a conference sponsored by a professional association of which she is a member.

## 5 C.F.R. § 2635.101

(a)    Public service is a public trust.   Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the

integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.

(b)    General principles.   The following general principles apply to every employee and may form the basis for the standards contained in this part. Where a situation is not covered by the standards set forth in this part, employees shall apply the principles set forth in this section in determining whether their conduct is proper.

(1)   Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.

(2)   Employees shall not hold financial interests that conflict with the conscientious performance of duty.

(3)   Employees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest.

(4)   An employee shall not, except as permitted by subpart B of this part, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

(5)   Employees shall put forth honest effort in the performance of their duties.

(6)   Employees shall not knowingly make unauthorized commitments or promises of any kind purporting to bind the Government.

(7)   Employees shall not use public office for private gain.

(8)   Employees shall act impartially and not give preferential treatment to any private organization or individual.

(9)   Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

(10)   Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

(11)   Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.

(12)   Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations, especially those— such as Federal, State, or local taxes—that are imposed by law.

(13)   Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

(14)   Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

(c)   Related statutes.   In addition to the standards of ethical conduct set forth in this part, there are conflict of interest statutes that prohibit certain conduct. Criminal conflict of interest statutes of general applicability to all employees, 18 U.S.C. 201, 203, 205, 208, and 209, are summarized in the appropriate subparts of this part and must be taken into consideration in determining whether conduct is proper. Citations to other generally applicable statutes relating to employee conduct are set forth in subpart I and employees are further cautioned that there may be additional statutory and regulatory restrictions applicable to them generally or as employees of their specific agencies. Because an employee is considered to be on notice of the requirements of any statute, an employee should not rely upon any description or synopsis of a statutory restriction, but should refer to the statute itself and obtain the advice of an agency ethics official as needed.

## 5 C.F.R. § 2635.106

(a)  Except as provided in § 2635.107, a violation of this part or of supplemental agency regulations may be cause for appropriate corrective or disciplinary action to be taken under applicable Governmentwide regulations or agency procedures. Such action may be in addition to any action or penalty prescribed by law.

(b)  It is the responsibility of the employing agency to initiate appropriate disciplinary or corrective action in individual cases. However, corrective action may be ordered or disciplinary action recommended by the Director of the Office of Government Ethics under the procedures at part 2638 of this chapter.

(c)  A violation of this part or of supplemental agency regulations, as such, does not create any right or benefit, substantive or procedural, enforceable at law by any person against the United States, its agencies, its officers or employees, or any other person. Thus, for example, an individual who alleges that an employee has failed to adhere to laws and regulations that provide equal opportunity regardless of race, color, religion, sex, national origin, age, or handicap is required to follow applicable statutory and regulatory procedures, including those of the Equal Employment Opportunity Commission.

## 28 C.F.R. § 45.4

(a)  Employees may use Government property only for official business or as authorized by the Government. See 5 CFR 2635.101(b)(9), 2635.704(a). The following uses of Government office and library equipment and facilities are hereby authorized:

(1)  Personal uses that involve only negligible expense (such as electricity, ink, small amounts of paper, and ordinary wear and tear); and

(2)  Limited personal telephone/fax calls to locations within the office's commuting area, or that are charged to non-Government accounts.

(b)     The foregoing authorization does not override any statutes, rules, or regulations governing the use of specific types of Government property (e.g. internal Departmental policies governing the use of electronic mail; and 41 CFR (FPMR) 101–35.201, governing the authorized use of long-distance telephone services), and may be revoked or limited at any time by any supervisor or component for any business reason.

(c)     In using Government property, employees should be mindful of their responsibility to protect and conserve such property and to use official time in an honest effort to perform official duties. See 5 CFR 2635.101(b)(9), 2635.704(a), 2635.705(a).

## Statement of the Issues

I.      Did the Government Failed to Present Sufficient

        Evidence Supporting the Jury's Verdicts?

II.     Did the District Court's Structural Error in the Bribery

        Instruction Lead the Jury to Convict Paitsel Based on

        Conduct that did not Constitute Bribery or Conspiracy to

        Commit Bribery?

## Statement of the Case

David Paitsel was an FBI Special Agent who was convicted at trial of

bribery and conspiracy to commit bribery. In this direct appeal from his

convictions, Paitsel shows that the jury convicted him based on evidence that

did not constitute a bribery offense. Paitsel shows further that the district court

committed reversible, structural error by directing a verdict on an essential

element of both the bribery and conspiracy charges.

### *Course of Proceedings*

A federal grand jury in the District of Columbia returned a superseding

indictment charging David Paitsel with one count of conspiring with Brian

Bailey to commit bribery, in violation of 18 U.S.C. § 201(b)(1)(C) and

(b)(2)(C), and 18 U.S.C. § 371 (Count 3); and one count of accepting a bribe

from Bailey in return for being induced to do an act in violation of his official duty, in violation of section 201(b)(2)(C) (Count 5). App'x 59 (Doc. 18). The indictment alleged that Paitsel had a variety of "lawful and official duties" arising from federal regulations governing the ethics of government employees:

1. a duty under 5 C.F.R. § 2635.702 not to use his "position" as an FBI Special Agent for his own private gain;

2. a duty under 5 C.F.R. § 2635.703(b) not to use "nonpublic information" to further his private interests or those of another;

3. a duty under 5 C.F.R. § 2635.704(a) to make "an honest effort to use official time and government property only for official business";

4. a duty under 5 C.F.R. § 2635.101(b)(14) "to endeavor to avoid any actions creating the appearance that [he] was violation the law or … ethical standards"; and

5. a duty not to engage in "outside employment, except under limited circumstances and with prior approval from the FBI."

*See* App'x at 72 (Doc. 18 at 13). The indictment alleged further that "FBI policy" generally prohibits Special Agents such as Paitsel from "engaging in outside employment, except under limited circumstances and with prior approval from the FBI." App'x at 72–73 (Doc. 18 at 13–14).

The indictment charged codefendant Bailey with engaging in conspiracy in violation of section 371 and of bribing both Paitsel and another government official in violation of 18 U.S.C. § 201(b)(1)(C). App'x at 60 (Doc. 18). (That

official was not named in the indictment, but evidence at trial showed that the official was an administrative assistant at the District of Columbia Department of Housing and Community Development.)

Following a nine-day trial, a jury found both Paitsel and Bailey guilty as charged. *See* Doc. 244. The court later sentenced Paitsel to serve 24 months' imprisonment, to be followed by 24 months' supervised release. *See* Doc. 300.

This appeal followed. Doc. 304.

## Statement of the Facts

**A.    The Tenants Opportunity to Purchase Act**

The Tenants Opportunity to Purchase Act (the "TOPA") is a Washington, D.C., law that requires landlords to offer their tenants an opportunity to purchase a property before the property is sold to others. App'x at 180–81, 236–27 (Doc. 249 at 66–67, 121–22). Tenants can sell this right of first refusal to others. Doc. 249 at 67, 122. The District of Columbia Department of Housing and Community Development (the "DHCD") administers the TOPA program. App'x at 236 Doc. 249 at 66.

Under the TOPA program, when an owner of property that is leased to tenants contracts with a potential buyer for the sale of that property, the property owner must notify each of the tenants of the owner's intent to sell and

must post a notice in a conspicuous place in a common area of the property being sold. App'x at 181–82, 253, 301, 795 (Doc. 249 at 67–68, 139, 187; Doc. 252 at 162). The notice must include the price that the owner seeks for the property and any other terms of the sale, and it must inform the tenants of their right to purchase the property at that price and under those terms. App'x at 237, 795 (Doc. 249 at 123; Doc. 252 at 162).

The same day the owner issues the notice to the tenants, the owner must file an offer-of-sale-notice with the District of Columbia, notifying the district that the owner has complied with the TOPA. App'x at 181–82, 237, 794 (Doc. 249 at 67–68, 123; Doc. 252 at 161); *see, e.g.,* Gov't Ex. 105A at 3–5. The offer-of-sale notice must include the names of all the tenants whom the owner has notified. App'x at 182, 240, 795 (Doc. 249 at 68, 126; Doc. 252 at 162).

Before August 2016, the DHCD kept a distribution list of hundreds of real estate agents and developers and emailed everyone on the list a weekly compilation of properties that were the subject of TOPA notices. App'x at 273–76 (Doc. 249 at 159–62). Since August 2016, the DHCD has been posting the weekly compilation on its website instead. App'x at 225–26, 242, 270–72, 275, 804 (Doc. 249 at 111–12, 128, 156–57, 161; Doc. 252 at 171). Those posts include the address of the pertinent property and the price the landlord has been offered for it. App'x at 271–72 (Doc. 249 at 157–58). Investors seeking to

purchase tenants' rights of first refusal can use the posted information to go to the posted address and reach out to the tenants directly. App'x at 273, 800–01, 807 (Doc. 249 at 159; Doc. 252 at 167–68, 174). They can also find the names and unit numbers of affected tenants in any conspicuously posted TOPA notice placed in the common area of an affected property. App'x at 301–02, 800-01 (Doc. 249 at 187–88; Doc. 252 at 167–68).

Because some investors may become overly aggressive in seeking to obtain tenants' TOPA rights, Lauren Pair, who was the rental conversion and sale administrator for DHCD, came up with an unwritten policy in 2016 or 2917 of releasing the names of tenants only to any "party directly involved with the transaction." App'x at 234, 240, 261–62 (Doc. 249 at 120, 126, 147–48.) Anyone else would have to submit a Freedom of Information Act request. App'x at 241 (Doc. 249 at 127). The requestor would then receive the requested documents but with the tenants' names and other personal information redacted. App'x at 241 (Doc. 249 at 127). But the DHCD continued to release unredacted offer-of-sale notices to any verified tenant who lives in the building, to anyone to whom a tenant had assigned the right of first refusal, or to any realtor or title company who was party to a transaction, among others. App'x at 182–83, 217 (Doc. 249 at 68–69, 103).

Pair supervised administrative assistant Dawne Dorsey. App'x at 179–

80, 234–35 (Doc. 249 at 65–66, 120–21). Dorsey's job responsibilities included responding to inquiries from members of the public who called the office and collecting the TOPA forms that landlords delivered to the office. App'x at 249 (Doc. 249 at 135).

## B.     Bailey's Purchases of Tenants' TOPA Rights

Bailey is a real estate agent and investor who owns a large portfolio of multifamily properties in the Washington, D.C., area. App'x at 702 (Doc. 252 at 69). When he first learned about the TOPA program in 2004, he began watching the real estate Multiple Listing Service ("MLS") to find leased properties the moment they were listed for sale. App'x at 203–05 (Doc. 252 at 70–72). Even before any TOPA notices had been issued or filed with the DHCD, he would use commercially available databases and other means to try to find contact information for the tenants who would have TOPA rights relating to those properties. App'x at 703–05 (Doc. 252 at 71–72).

In addition, at least twice weekly, he would go to the DHCD office and submit FOIA requests for TOPA information on leased properties he had found on the MLS. App'x at 704–13 (Doc. 252 at 71–80). In response to those requests, he would receive a file containing everything that a seller had submitted to the DHCD. App'x at 710 (Doc. 252 at 77). Many of those files contained the names and telephone numbers of the tenants occupying leased

properties that were being sold. App'x at 709–10, 717 (Doc. 252 at 76–77, 84).

Bailey was given whatever the seller had filed. App'x at 709–10, 717 (Doc. 252 at 76–77, 84). Bailey visited the DHCD office so frequently that the employees eventually did not require him to complete FOIA requests before giving him the information that he sought. App'x at 711 (Doc. 252 at 78).

Upon finding the tenants, Bailey would offer to purchase their TOPA rights in exchange for having them vacate the property. *See* App'x at 677–78, 717 (Doc. 252 at 44–45, 84). After successfully purchasing a tenant's rights, he would then sell his right to purchase the property to another investor who actually intended to take title to the now-vacated property. App'x at 677–78 (Doc. 250 at 44–45).

Initially, Bailey's friend Alvin Rice partnered with him to try to close the TOPA deals. App'x at 417–18, 771 (Doc. 250 at 68–69; Doc. 252 at 140. Rice was responsible for doing "skip tracing"—that is, searching via commercially available search engines the information on websites and databases such as Google, whitepages.com, Spokeo, LEXIS-NEXIS, and others to find tenants' contact information. App'x at 417–426 (Doc. 250 at 69–70, 72–73, 77; Doc. 251 at 68). Rice could have obtained additional information, such as social security numbers, credit reports, and employment history by paying some of

these sites an extra fee, but he never did.[1] App'x at 422–425 (Doc. 250 at 73–76).

By 2016, Bailey had visited the DHCD so many times that he had developed a friendship with Dorsey. App'x at 724–25 (Doc. 252 at 91–92). Dorsey offered to send Bailey TOPA notices electronically so that he would not have to go to the office to get them. App'x at 782–84 (Doc. 252 at 149–51). She then began sending Bailey unredacted TOPA notices, together with all of their attachments. App'x at 782–84 (Doc. 252 at 149–51). Because she was saving him time and money, Bailey began paying Dorsey a "convenience fee" for those services. App'x at 724–27, 783–84 (Doc. 252 at 91–94, 150–51). Between February of 2016 and September of 2018, Dorsey sent Bailey 1611 TOPA notices. App'x at 366–67 (Doc. 250 at 17–18).

## C.  Paitsel's Assistance to Bailey

In 2016, Paitsel was an FBI Special Agent. App'x at 444–45 (Doc. 250 at 95–96). He had met Bailey in 2011, when they had both been in a real estate class at the University of Maryland. App'x at 754 (Doc. 252 at 111). The two had become close friends—like brothers—and, from 2011 until 2012, Paitsel had lived with Bailey and his family. App'x at 755 (Doc. 252 at 122). They had

---

[1] Eventually, Rice stopped working with Bailey on TOPA deals because they were not making any money. Doc. 250 at 72.

also invested in real estate together. App'x at 754 (Doc. 252 at 121).

As Bailey continued to work on his TOPA property investments, he sometimes asked Paitsel to help him find contact information for tenants. App'x at 522–24, 584–86, 684–88 (Doc. 250 at 173–75; Doc. 251 at 37–39; Doc. 252 at 51–55). Paitsel was not a field agent, and he was not involved in investigations; rather, from 2016–2017, Paitsel worked as the chief of the FBI's Strategic Technology Unit. App'x at 444–45 (Doc. 250 at 95–96). According to his then-supervisor, "[h]is core responsibility was to liaison with the workforce, to include professional staff and special agents, to help us gather what we call the business requirements to, one, either enhance current capabilities of systems that we currently have or, two, to build—help us build capabilities that is required, that is current a gap within the workforce to enhance the job." App'x at 445 (Doc. 250 at 96). In other words, he worked as a liaison between FBI Special Agents who were conducting investigations, FBI staff members, and other FBI employees. App'x at 445 (Doc. 250 at 96). He performed those duties well and successfully. App'x at 462–73 (Doc. 250 at 113–24). Indeed, his supervisor evaluated his job performance as "excellent." App'x at 464 (Doc. 250 at 115).

As an FBI Special Agent, Paitsel had been assigned an account number that allowed him to access the CLEAR database. App'x at 679 (Doc. 252 at

46). CLEAR is a "risk and fraud database that provides public record and proprietary information on people, business, phones, and assets." App'x at 483 (Doc. 250 at 134). That information includes names, social security numbers, birth dates, aliases, email addresses, employers, and other data. App'x at 622 (Doc. 251 at 75). When a CLEAR user enters a search term, the system searches through information gathered from approximately 20 databases, including credit bureaus, the Department of Corrections, real-property tax-assessment agencies, and others. App'x at 483–85, 494–95, 508–09, 514 (Doc. 250 at 134–36, 145–46, 159–60, 165). Although most information in the CLEAR database is commercially available to anyone who pays for it, App'x at 626 (Doc. 251 at 79), real-time incarceration data and information from license-plate readers is available only to law-enforcement users, App'x at 512 (Doc. 250 at 163).

Privacy legislation relating to some of the information that CLEAR assembles requires CLEAR clients to confirm that they are using that information only for certain permissible purposes. App'x at 485–86 (Doc. 250 at 136–37). To ensure that FBI users are accessing the CLEAR database only for permissible purposes, each user can proceed with a search only by first identifying such a purpose. App'x at 487–94, 500 (Doc. 250 at 138–45, 151). FBI employees are not supposed to use the CLEAR system for their own

business purposes or to look up information for a friend. App'x at 499–500

(Doc. 250 at 150–51).

Bailey never asked Paitsel to use his FBI CLEAR account or any other

FBI resource to find tenants, and he never offered Paitsel any type of

remuneration to do so. App'x at 622–23 (Doc. 251 at 75–76). But he did

sometimes ask Paitsel to help him track down tenant contact information.

App'x at 599–603 (Doc. 252 at 52–56); *see* Gov't Ex. 104C (summarizing

emails between Bailey and Paitsel). For example, on February 28, 2017, at

8:09 p.m. Bailey emailed Paitsel on Paitsel's personal Gmail account, saying:

> Dave …
>
> I need your help. I've skip traced these people and staked them
> out. I can't find anything or seem to catch up with them. This is
> pretty much my last resort. I'm free all this week to meet but
> Friday is cool for dinner. Here are the targets. I need cell and or
> home numbers on them.
>
> Imani Walker – 517 Longfellow Street NW 20011
>
> Rhonda Thomas – 337 54th Street NE 2019
>
> Kenneth Pearson – 1283 Oates Street NE 20002
>
> Dana Noble – 1275 Oates Street NE 20002
>
> Thanks Dave

Gov't Ex. 104B at 2. Shortly after receiving Bailey's request, Paitsel searched

CLEAR from 9:12 p.m. to 9:22 p.m., and, later that night, he emailed Bailey

phone numbers, addresses, and email addresses for some of those people. *See* Gov't Ex. 104 B at 2.

Similar exchanges followed, with Bailey usually asking Paitsel for tenant phone numbers. *See, e.g.,* Gov't Ex. 104B at 5, 12, 44. When Bailey was unsuccessful reaching tenants by phone, he sometimes would ask Paitsel if he could find other contact information, such as an email address. *See, e.g.,* Gov't Ex. 104B at 45. On one occasion, he also asked Paitsel to find out what he could about a property, saying, "Any info would be good … most importantly, how much they paid for it, how much they owe and who is the lender." App'x at 610–11 (Doc. 251 at 63–64).

In his attempts to help Bailey, Paitsel searched CLEAR during his off-duty hours to try to find the information that Bailey sought. App'x at 502–03, 531–32, 586, 671–76 (Doc. 250 at 153–54, 182–83; Doc. 251 at 39; Doc. 252 at 38–43); s*ee* Gov't Ex. 104C. He never accessed any information relating to an FBI investigation, any confidential source material, or any witness material. App'x at 665–66 (Doc. 252 at 32–33).

On many occasions, Paitsel found the information that Bailey needed. *See, e.g.* Gov't Ex. 104B at 3, 62. Although that information most frequently included phone numbers and addresses, a few times, Paitsel found and passed on more personal information, including dates of birth, social security

numbers, and other identifying information. *See, e.g.,* App'x at 619 (Doc. 251 at 72); *see, e.g.,* Gov't Ex. 104B at 45, 80–81, 627. Many of Paitsel's emails to Bailey showed that the information he was sharing had been pulled from voter rolls, Experian, Transunion, phone records, vehicle records, driver licenses, utility records, and other publicly available sources. *See, e.g.,* Gov't Ex. 104B at 62, 80–81, 626.

Paitsel had been helping Bailey in this fashion for several months when, on May 12, 2017, Bailey told Paitsel that he had reached one of the tenants whom Paitsel had found, Patrick Brown. Gov't Ex. 104B at 44. For the first time, Bailey told Paitsel that he wanted to compensate Paitsel for the help he had been providing. *Id.* He said, "If I get paid off of it I'm going to give u 5K." Gov't Ex. 104B at 45.

After that, Bailey continued to promise Paitsel that he intended to reward Paitsel for information he had previously conveyed. On June 17, 2017, Bailey emailed Paitsel on his personal Gmail account telling him that he owed Paitsel "5K" because he had found a tenant who had assigned him his TOPA rights. *See* Gov't Ex. 106E. On September 13, 2017, Bailey sent a text message to Paitsel saying, "September 29 foreclosing on 3021 15th Street, bro. I will give you 5K. Keep your fingers crossed. You know how those closings go. Hope all is well, bro. Thanks. B." App'x at 604–05 (Doc. 251 at 57–58). Six

months later, on December 1, 2017, Bailey emailed Paitsel again, telling him that he hoped a property would close by the beginning of 2018, and that he would give Paitsel "1500–2500." *See* App'x at 605 (Doc. 251 at 58). And, on May 27, 2018, Bailey sent Paitsel a text message, saying that he had tracked down a tenant on another property and, because she had assigned him her TOPA rights, they would have some money coming their way. *See* App'x at 620 (Doc. 251 at 73).

Bailey ultimately made good on some of his promises. In October of 2017, he withdrew $4100 in cash from his bank account before meeting with Paitsel. *See* Doc. 251 at 49–50. And, on January 12, 2018, he wrote Paitsel a check for $6500. App'x at 596–57 (Doc. 251 at 61–62); *see* Gov't Exs. 1N, 1O.

**B.** **Paitsel's Objection to Admission into Evidence of the Government-Employee Ethics Regulations**

Before trial, Paitsel objected to the relevance of federal regulations that the government proposed to offer as evidence: 5 C.F.R. § 2635.702 (use of public office for private gain); 5 C.F.R. § 2635.703 (use of nonpublic information); 5 C.F.R. § 2635.704 (use of government property for other than an authorized purpose); and 5 C.F.R. § 3801.105 (personal use of government property). *See* Doc. 119. He also objected to the relevance of the FBI Ethics and Integrity Program Directive. *See* Doc. 119. In response to the objection,

the government argued that the cited regulations set out the "lawful and official duties of FBI agents … as incorporated into the FBI Ethics and Integrity Program Policy Directive" and that the "authorities [were] directly probative of whether Defendant Paitsel violated his lawful and official duty not to use his FBI-issued CLEAR Account for his own private gain, and therefore, his guilt." Doc. 133 at 3.

Ultimately, the court ruled that the regulations—and state regulations regarding the conduct of District of Columbia employees—were relevant because the "existence of these policies, even if not specific to Paitsel or Dorsey, ma[de] it 'more or less probable' that each had a lawful duty to maintain the confidentiality of the documents for which Bailey allegedly paid them." App'x at 110 (Doc. 216 at 12); *see* App'x 466 (Doc. 250 at 117). The court ruled further that, to the extent that Paitsel and Bailey were "concerned that the jury may consider these exhibits as 'lawful duties' when they are not as a matter of law," the Court would address that issue via the jury instructions. App'x at 110 (Doc. 216 at 12).

During the trial, the district court admitted into evidence all of the regulations setting forth the "Standards of Ethical Conduct for Employees of the Executive Branch" without limiting the jury as to their appropriate use. *See* App'x at 436 (Doc. 250 at 87); Gov't Ex. 7A. And the government had a

witness—Paitsel's FBI supervisor—read many of those regulations to the jury. App'x at 448–53 (Doc. 250 at 99–104). Asked by the government whether "there is a prohibition on FBI employees using government property for things other than authorized purposes," the witness responded, "Yes, ma'am." App'x at 453 (Doc. 250 at 104). The witness testified further that Paitsel had received training on these "standards of conduct." App'x at 453–54 (Doc. 250 at 104–05).

The government turned next to its exhibit 8—the FBI Ethics and Integrity Program Policy Directive and Policy Guide—and directed the witness to the provision on "Misuse of Position." App'x at 4545 (Doc. 250 at 105). Pointing out that the guide refers to the same regulations the witness had just read, the government asked, "So does this manual incorporate the regulations that govern FBI conduct.?" App'x at 455 (Doc. 250 at 106). The witness again responded, "Yes, ma'am." App'x at 455 (Doc. 250 at 106). The witness also testified that FBI agents are required to report any outside employment "[t]o ensure compliance, no conflict of interest, and to make sure it's in accordance with what is expected of them as an FBI employee." App'x at 456 (Doc. 250 at 107). He said that Paitsel had not reported any such outside employment. App'x at 456 (Doc. 250 at 107).

The witness also testified regarding examples set forth in the FBI Policy

Guide of conduct that violates the DOJ ethical standards. App'x at 468 (Doc. 250 at 119). Reading from the Guide, he testified:

> An FBI employee may not access any official FBI recordkeeping system to perform a criminal background or indices check to determine whether there is any derogatory information on a person who is dating her son. Such access constitutes a misuse of the nonpublic information contained in the database.
>
> Similarly, it would violate the standards for an employee to attempt to satisfy his or her curiosity by looking up the criminal histories of persons known to the employee or of public figures.

App'x at 468 (Doc. 250 at 119). He testified that these examples are provided to help guide the conduct of FBI employees and "suggest that it would violate the standards of conduct to look up … the criminal histories of persons that are known to somebody[.]" App'x at 469 (Doc. 250 at 120).

## C. Paitsel's Motion for a Judgment of Acquittal

At the close of the government's case and again at the close of the evidence, Paitsel moved for a judgment of acquittal on both counts of the indictment, arguing among other things that the bribery statute was not intended to reach the conduct proven in this case, that no evidence showed that Paitsel had acted with corrupt intent, and that no evidence showed that Bailey had induced Paitsel to violate an official duty. Doc. 239 at 6–9; App'x at 693 (Doc. 252 at 60); App'x at 892 (Doc. 253 at 61). Bailey did too, arguing among other things that Dorsey's supposed violation of state ethics policies

had nothing to do with Dorsey's lawful duties as a program specialist at DHCD. App'x at 888 (Doc. 253 at 57). Bailey argued that, otherwise, for example, a DOJ employee could be charged with bribery if someone gave him $10 to look at an Instagram page and "like" a few posts, causing him to deviate from his ethical duty to "give honest efforts" in performing his job. App'x at 889 (Doc. 253 at 58). Bailey argued that such a possibility was why he had objected to the admission of the state ethics rules—it placed "unbelievably broad rules" in front of the jury and allowed them to pick from among them to find something wrong and, on that basis, to convict him of a crime, even though the indictment based Dorsey's "violation of duty" on an office policy, which the evidence failed to bear out. App'x at 891–96 (Doc. 253 at 60–65).

Ultimately, the court denied both Paitsel's and Bailey's motions. Docs. 263, 264, 265.

## D. The Proposed Jury Instructions

In advance of trial, the government submitted proposed jury instructions. *See* Doc. 110. As to the Count-three conspiracy charge, the government proposed that the district court instruct the jury among other things that,

> For Mr. Paitsel to be found guilty of Count Three, the Government must prove three things beyond a reasonable doubt: first, that between February 2016 and June 2017 there was an agreement to commit bribery; second, that Mr. Paitsel intentionally joined in that agreement; and third, that one of the

18

people involved in the conspiracy engaged in one overt act.
Doc. 110-1 at 6. The proposed conspiracy instruction did not explain the elements of bribery.

As to Bailey, the elements of bribery were found in the government's proposed instructions on Count 2 and 4. Doc. 110-1 at 7. The proposed instruction on Count 4 said that, to find *Bailey* guilty of bribery, the jury would have to find that the government had proven, among other things, that Bailey had intended to "induce David Paitsel to violate his official duty not to use government resources for non-official business." Doc. 110-1 at 7.

As to Paitsel, the elements of bribery were found in the proposed Count 5 charge, which said that, to find Paitsel guilty of bribery, the jury would have to find that the government had proven, among other things, that Paitsel had sought or received something of value "in return for being induced to violate his official duty not to use government resources for non-official business." Doc. 110-1 at 7–8.

The defendants objected to both the government's proposed conspiracy instruction and its proposed bribery instruction.[2] Docs. 111, 196. As to the

---

[2] Prior to that, the district court had expressly stated that the court would assume that all objections and motions during the course of the trial would be adopted by the codefendant. Doc. 137 at 41..

proposed bribery instruction, Bailey asserted that a factual dispute existed as to what constituted the "official duties" of the public official at the DHAC whom he had supposedly bribed, and he requested the court to revise the instructions on all of his substantive bribery counts to remove any reference to a particular "official duty." Doc. 196 at 4–5. He proposed that the court instruct the jury on Counts 2 and 4, as follows:

> To find Mr. Bailey guilty of bribery as charged in Count Two, you must find that the Government proved each of the following three elements beyond a reasonable doubt:
>
> First, that Mr. Bailey gave, offered, or promised something of value to Dawne Dorsey.
>
> Second, that Ms. Dorsey was then a public official by virtue her being employed as a Program Specialist at the District of Columbia Department of Housing and Community Development.
>
> **Third, that Mr. Bailey did so corruptly, with the intent to induce Dawne Dorsey to violate her official duty.**
>
> In Count 4 of the indictment, Brian Bailey is charged with giving, offering, or promising to pay a bribe to a public official— that is, David Paitsel. To find Mr. Bailey guilty of bribery as charged in Count 4, you must find that the Government proved each of the following three elements beyond a reasonable doubt:
>
> First, that Mr. Bailey gave, offered, or promised something of value to David Paitsel.
>
> Second, that Mr. Paitsel was then a public official by virtue of his being employed as a Supervisory Special Agent for the Federal Bureau of Investigation.

> **Third, that Mr. Bailey did so corruptly, with the intent to induce David Paitsel to violate his official duty.**

Doc. 196 at 4–5 (emphasis added). Bailey thus asked the court to leave to the jury the factual question of exactly what constituted both Dorsey's and Paitsel's "official duties." *See id.*

The district court agreed to do so. App'x 87 (Doc. 201 at 2). But, in the next draft of the jury instructions, the court revised the third element only of the bribery charges against Bailey (Counts 2 and 4). *See* App'x 85–97 (Doc. 201; Doc. 201-1 at 1–3. The court left the instruction on the Count 5 bribery charge stating that the United States would have to prove that Paitsel had acted "corruptly, in return for being induced to violate his official duty not to use government resources for non-official business." *See* App'x at 94–95 (Doc. 201-1 at 3–4).

Agreeing that "the question of whether an official or lawful duty exists is a factual question for the jury," the government asked for more changes. *See* Doc. 202 at 1–2, 4. As to the Count 5 bribery charge against Paitsel, the government proposed that the court instruct the jury this way as to the third element:

> Third, that Mr. Paitsel did so corruptly, in return for being induced to violate his official duty.

Doc. 202 at 3–4. The government thus agreed and proposed that the court should not instruct the jury that Paitsel had an "official duty" not to use government resources for non-official business, but should instead leave the "official duty" question to the jury. *See id.*

## E.    The Government's Closing Argument

By the time of the closing argument, the government had abandoned any discussion of Paitsel's "official duty" and focused the jury instead entirely on Paitsel's "lawful duty." *See* App'x at 1025 (Doc. 308 at 67). When explaining the elements of bribery as to Paitsel, the government told the jury that the third element the government had to prove on the bribery charge against Paitsel was that "Paitsel had a *lawful duty* as an FBI and DOJ employee not to provide sensitive personal information to Brian Bailey." App'x at 1025 (Doc. 308 at 67) (emphasis added). The government then told the jury that this element was "an easy one," because two federal regulations "spelled out" "exactly how FBI agents are supposed to behave, how they are supposed to use their time, how they are supposed to use government resources." App'x at 1025–26 (Doc. 308 at 67–68). The government argued that other non-duty-related conduct automatically qualified too, saying, "And you also know he had a lawful duty because the CLEAR database told David Paitsel every time he logged in that

he needed to comply with the law, state a legitimate reason for using that database." App'x at 1026 (Doc. 308 at 68).

This theme carried over into the government's argument on the conspiracy charge:

> You see, under our laws, an FBI agent can't use resources paid for by the government to do favors for his friends, period, full stop. And when he does those favors in exchange for money, that's bribery. And that's true no matter how long you have been friends, no matter how big or small the favor might be, and no matter how big or small the bribe might be.

> And for Brian Bailey, under our laws, he's not allowedto turn government employees like Dawne Dorsey and Brian Bailey—like Dawne Dorsey and David Paitsel into his own personal assistants who can get him names and telephone numbers whenever he wants no matter how long he's known them, no matter how big or how small the payment might be. But that's exactly what Brian Bailey did here.

App'x at 1027 (Doc. 308 at 69). The government concluded, "That's why Brian Bailey and David Paitsel are guilty on all of the Counts in the indictment." App'x at 1028 (Doc. 308 at 70).

## F.     The Court's Final Instructions to the Jury

The court instructed the jury that it could convict Paitsel on the Count 3 conspiracy charge if the government proved:

> First, that between February 28, 2017 and June 1, 2018, *there was an agreement to commit bribery*.

> Second, that Mr. Paitsel intentionally joined in that agreement,

and

Third, that one of the people involved in the conspiracy engaged in one overt act described in the indictment.

App'x at 1140 (Doc. 309 at 63) (emphasis added). The instruction did not

explain to the jury what constituted "bribery." *See* App'x at 1140–42 (Doc. 309

at 63–65).

When addressing the bribery counts, the court started with the counts

that charged Bailey. App'x at 1142 (Doc. 309 at 65). The court instructed the

jury that, to prove that Bailey had committed bribery, it had to find that the

government had proven, among other things, that "Mr. Paitsel had a *lawful*

*duty* not to use government resources for nonofficial business and/or to keep

confidential the information for which Mr. Bailey allegedly gave, offered, or

promised something of value to Mr. Paitsel." App'x at 1144 (Doc. 309 at 67)

(emphasis added). The court instructed the jury further:

> *For purposes of this instruction*, a lawful duty is any statutory, regulatory, or official duty imposed upon Mr. Paitsel either orally or in writing by virtue of and specific to his position as the supervisory special agent for the Federal Bureau of Investigation.

> *As for Count 4*, the existence of a lawful duty may be proven through direct or circumstantial evidence. If you find that a lawful duty existed, subsequent nonenforcement or uneven enforcement doesn't matter. The lawful duty continues to exist.

App'x at 1144–45 (Doc. 309 at 67–68) (emphasis added). The court then gave

examples of "lawful duties":

> For example, although a law against jaywalking may be rarely enforced, it remains unlawful to jaywalk. Similarly, when a lawful duty bars a public official from providing certain material to a private individual, it doesn't matter that those materials might be available from another private source.

> For example, certain regulations may prevent a government employee from selling a government printer to a private individual. That the private individual could buy the same printer for the same price from a private store does not matter. The government employee has still violated that lawful duty by selling the government printer to a private individual.

App'x at 1145 (Doc. 309 at 68).

The court turned next to the bribery charge against Paitsel, telling the jury that, "to find Mr. Paitsel guilty of bribery as charged in Count 5," the jury would have to find that the government had proven beyond a reasonable doubt:

> First, that Mr. Paitsel directly or indirectly demanded, sought, received, accepted, and/or agreed to receive and accept something of value.

> Second, Mr. Paitsel was then a public official by virtue of his being employed as a supervisory special agent for the Federal Bureau of Investigation.

> Third, that Mr. Paitsel did so corruptly in return for being induced to violate *his official duty not to use government resources for nonofficial business*.

App'x at 1146 (Doc. 309 at 69) (emphasis added). The court followed that with

additional instructions that applied to all the bribery charges. App'x at 1146–49 (Doc. 309 at 69–72). None of the instructions told the jury that one of the elements of bribery as to Paitsel was the acceptance of remuneration in exchange for agreeing to violate an "official duty" or that it was the jury's responsibility to determine what constituted Paitsel's "official duty" as an FBI Special Agent. *See* App'x at 1146–49 (Doc. 309 at 69–72).

## Standard of Review

I.     This Court reviews de novo whether sufficient evidence supports the jury's verdict. *United States v. Eiland*, 738 F.3d 338, 356 (D.C. Cir. 2013).

II.     Ordinarily, when reviewing a challenge to a jury instruction, "[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards." *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010). Although the propriety of a jury instruction is reviewed de novo, "the choice of language to be used in a particular instruction. . . is reviewed only for abuse of discretion." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993).

If the defendant fails to object to an instruction before the jury retires to deliberate, this Court will review the instruction only for plain error affecting

the defendant's substantial rights and the fairness and integrity of the judicial proceeding. *See* Fed. R. Crim. P. 52(b); *United States v. Bryant*, 523 F.3d 349, 353 (D.C. Cir. 2008). When, as here, the district court directs a verdict on an element of the offense, however, the district court commits structural error. *See Payne v. Stansberry*, 760 F.3d 10, 14 (D.C. Cir. 2014). A structural error of this nature constitutes plain error that affects the defendant's substantial rights and the fairness and integrity of the judicial proceeding, *id.* at 14–16, regardless of the lack of prior objection.

## Summary of the Argument

I.     The federal bribery statute under which Paitsel was charged prohibits a public official from entering into an upfront *quid pro quo* agreement to accept payment in return for doing an act that violates an official duty. The evidence here showed only that Bailey offered to reward Paitsel long after Paitsel had agreed to help Bailey find contact information for tenants of certain rental properties. Because that conduct did not constitute bribery or conspiracy to commit bribery, the evidence does not support the jury's verdicts.

Moreover, this Court and the Supreme Court have said that the federal bribery statute is not about officials' moonlighting. or their misuse of government resources, or the two in combination. Although those types of

activities may violate federal ethics regulations, the bribery statute does not sufficiently notify federal employees that violations of ethics regulations may be charged as crimes.

Yet the district court admitted at trial extensive evidence of the ethics regulations governing the conduct of federal employees, and, without tying those regulations to any of Paitsel's job responsibilities as an FBI Special Agent, the government argued to the jury that Paitsel's violation of those regulations established that he had committed bribery. Because no evidence established that Paitsel had agreed to corrupt his official decision making, the jury must have based its verdict entirely on evidence showing only that he had violated the ethics regulations upon which the government based its case. Because that conduct did not constitute bribery, his bribery conviction should be reversed.

II.    No matter how convincing the evidence, a court may not direct a verdict on any element of the offense. If it does, it commits structural error from which the defendant is entitled to relief. Here, the district court did just that, instructing the jury as a matter of fact that Paitsel had an "official duty not to use government resources for nonofficial business." In doing so, the district court improperly removed from the jury's consideration an element of the bribery offense—namely, what constituted the "official duty" he

supposedly had agreed to violate in exchange for remuneration. Moreover, because the court's instruction on the conspiracy-to-commit-bribery charge did not define the elements of bribery, the jury must have looked to the erroneous bribery instruction to find those elements. Consequently, the district court's structural error in the bribery instruction also infected the conspiracy instruction. Paitsel's conviction on both counts should be reversed.

## Argument and Citations of Authority

### I.   The Government Failed to Present Sufficient Evidence Supporting the Jury's Verdicts.

A friend asked David Paitsel to find contact information for tenants of Washington, D.C., properties. Wanting to help, Paitsel used a government resource—his FBI CLEAR account—during his non-work hours to find that information. After the friend had used the information to turn a profit in real-estate investments, the friend gave Paitsel a total of about $10,000 to show his appreciation for Paitsel's help.

Paitsel's acceptance of an after-the-fact payment that did not relate to any official act or duty did not, as a matter of law, constitute the acceptance of a bribe under 21 U.S.C. § 201(b)(2)(C) or a conspiracy to receive a bribe under 18 U.S.C. § 371. Moreover, even if the evidence had shown the existence of an upfront *quid pro quo* agreement between Bailey and Paitsel, no evidence

showed that Paitsel accepted Bailey's payment in return for being induced to do something that violated any of his "official duties" as an FBI Special Agent. For these reasons, Paitsel is entitled to relief from his convictions.

**a.      The Federal Bribery Statutory Scheme**

In 18 U.S.C. § 201, Congress established comprehensive prohibitions on the payment of both bribes and gratuities to federal officials. *Snyder v. United States*, No. 23-108, 2024 U.S. LEXIS 2843, *11 (U.S. June 26, 2024). As to gratuities, the statute imposes criminal penalties—including up to two years' imprisonment—on public officials who accept payment for "any official act" already done. *See* 18 U.S.C. § 201(c)(1)(B). The gratuity portion of the statute "contains no express *mens rea* requirement and simply makes it a crime for federal officials to accept a payment 'for or because of any official act.'" *Snyder*, 2024 U.S. LEXIS 2843, at *16. An "official act" is

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).

"[G]ratuities after the official act are not the same as bribes before the official act. After all, unlike gratuities, bribes can corrupt the official act—

meaning that the official takes the act for private gain, not for the public good."
*Snyder*, 2024 U.S. LEXIS 2843, at *9. Because "bribery can corrupt the official act, Congress treats **_bribery_** as a far more serious offense than gratuities." *Id.* (emphasis in original). If convicted of bribery under 18 U.S.C. § 201(b), a defendant faces up to 15 years' imprisonment. "[T]he dividing line between §201(b)'s bribery provision and §201(c)'s gratuities provision is that bribery requires that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act." *Id.* at *16 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U. S. 398, 404–05 (1999)). In other words, "for bribery, there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act." *Sun-Diamond*, 526 U.S. at 405.

Count 5 of the indictment charged Paitsel under section 201(b)(2)(C) with bribery relating to his official duties. That provision provides:

> (b)    Whoever—
>
> ….
>
> > (2)    being a public official … corruptly … accepts … anything of value … in return for:
> >
> > > (C)    being induced to do or omit any act in violation of the *official duty* of such official …

is guilty of bribery. 18 U.S.C. § 201(b)(2)(C) (emphasis added). Section

201(b)(2)(C) "undoubtedly overlap[s] in some considerable measure" with 18

U.S.C. § 201(b)(2)(A), which addresses bribery relating to a public official's

"official acts." *See United States v. Alfisi*, 308 F.3d 144, 151 n.3 (2d Cir. 2002)

(addressing section 201(b)(1)(A) and (C)). Section 201(b)(2)(A) provides:

> (b) Whoever—
> ….
>
> > (2) being a public official … corruptly … accepts … anything of value … in return for:
> >
> > > (A) being influenced in his the [*sic*] performance of any *official act*

commits bribery. 18 U.S.C. § 201(b)(2)(A) (emphasis added). Although section

201(a)(3) defines "official act," it does not define "official duty" as used in

section 201(b)(2)(C).[3]

## b.    The Government's Theory

As the government conceded in its response to Paitsel's motion for bond

pending appeal, Paitsel's conduct did not constitute the receipt of illegal

gratuities because of "the absence of any evidence of any 'official act.'" *See*

Doc. No. 2036135. In other words, no evidence showed that Paitsel had

---

[3] Section 201(a) defines "official act" as " as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

accepted anything of value in exchange for taking any action on a matter that might have been pending before him in his official capacity. *See* 18 U.S.C. § 201(b)(1)(C) (defining "official act").

Knowing that it lacked evidence tying Bailey's payments to any official act of Paitsel as an FBI Special Agent, the government understandably declined to charge that Paitsel had illegally accepted a gratuity under section 201(c) or had committed "official act" bribery in violation of section 201(b)(1)(A). This left the government with only one other possibility for charging Paitsel under section 201—that is, "official duty" bribery under section 201(b)(2)(C). But the trial revealed two fundamental flaws in that theory—(1) Paitsel and Bailey had no *quid pro quo* agreement, and (2) Bailey's payments to Paitsel were unrelated to any of Paitsel's official duties.

### i.   The Evidence Failed to Show any *Quid pro Quo* Arrangement.

As discussed above, a defendant cannot be convicted under section 201(b)(2)(C) unless the evidence shows that he acted "corruptly." In this context, "corruptly" means to act with a particular kind of "unlawful purpose" —a defendant must intend to accept a benefit as part of a "*quid pro quo*" in exchange for the violation of an official duty. *See Snyder*, 2024 U.S. LEXIS 2843, *34. The government must show, therefore, the existence of an "upfront

agreement" to exchange the payment for doing something in violation of an official duty. *Cf. Snyder*, 2024 U.S. LEXIS 2843, *34 (addressing the mens rea requirement of section 201(b)(2)(A)).

Yet the government produced no evidence in this case showing that Paitsel and Bailey had any upfront agreement at all. Indeed, during its closing argument, the government said that it had proven that Paitsel had acted "corruptly" because it had shown that he had lied about his reasons for accessing the CLEAR database. *See* App'x at 1022–23 (Doc. 308 at 64–65). But that evidence said nothing about the existence of an *upfront agreement* between Paitsel and Bailey.

Viewing the evidence on that question in the light most favorable to the government, the evidence showed only that Bailey had asked Paitsel to help him find contact information for tenants and then, of his own accord, had rewarded Paitsel months later with payment after-the-fact when information that Paitsel had procured ultimately helped Bailey turn a profit. *See, e.g.,* App'x at 604–05, 620 (Doc. 251 at 57–58, 73); Gov't Ex. 104B at 44, 45; Gov't Ex. 106E. If Paitsel had accepted the money because of an "official act," this might have violated the anti-gratuity provision. *See United States v. Ring*, 706 F.3d 460, 464 (D.C. Cir. 2013). But, given that the government has conceded that the payments did not relate to any "official act," and because the evidence showed

only that Bailey did not offer to pay Paitsel until long after Paitsel had searched his CLEAR account, the payments constituted neither gratuities nor bribes. Under these circumstances, the evidence did not support the jury's verdict on the Count 5 bribery charge.

Nor did the evidence show that Paitsel and Bailey had conspired to commit bribery. The indictment alleged that the conspiracy had two objects: (1) Bailey's payment of Paitsel intending to induce Paitsel to so something in violation of a lawful duty, in violation of section 201(b)(1)(C); and (2) Paitsel's acceptance of a payment in return for being induced to violate an official duty, in violation of section 201(b)(2)(C). To convict Paitsel of participating in a conspiracy to commit either of those crimes, the government would have had to have shown that the conspiratorial agreement related to an upfront *quid pro quo* arrangement. But, as explained above, evidence of such an arrangement was entirely absent here.

Therefore, Paitsel is entitled to relief from both of his convictions.

### ii.    The Evidence Failed to Show that Paitsel had Agreed to Violate any "Official Duty."

Even if the evidence had shown that Paitsel had an upfront agreement to accept payments from Bailey to use his CLEAR account to find tenant information, that conduct did not constitute either bribery or conspiracy to

commit bribery because "both [this Court's] precedent and the language of the [bribery] statute make clear that [18 U.S.C.] § 201 is not about officials' moonlighting, or their misuse of government resources, or the two in combination." *Valdes v. United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007). Instead, "[i]t is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal." *United States v. Muntain*, 610 F.2d 964, 968 (D.C. Cir. 1979); *Valdes*, 475 F.3d at 1325 (section 201 "concern[s] inappropriate influence on decisions that the government actually makes"); *see also Muntain*, 610 F.2d at 968 (the "anti-bribery statute [is] aimed at preventing public officials from accepting anything of value in exchange for particular decisions or actions taken or to be taken by the public officials in their official capacity"). As the Third Circuit said in *United States v. Labovitz*, 251 F.2d 393, 394 (3rd Cir. 1958), "[S]ociety deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision. The statute plainly proscribes such corrupt interference with the normal and proper functioning of government." *Id.*

Consequently, the "official duty" bribery provision relating to a public official's receipt of bribes—section 201(b)(2)(C)—has historically been used to prosecute efforts to influence a public official in the performance of acts that

fall within the scope of his job responsibilities relating to a government

function.[4] *See United States v. Heffler*, 402 F.2d 924, 926 (3rd Cir. 1968)

(interpreting a prior version of the "official duty" bribery provision and

explaining that, because the defendant's official public duties involved making

recommendations that influenced the award of contracts, his conduct in taking

bribes to attempt to influence those awards "was the very kind of corrupt

solicitation of a consideration for official misconduct as section 201(c) makes

criminal"); *see also United States v. Wansley*, 993 F.3d 519, 533 (7th Cir. 2021)

(Postal Service worker's accepting payments to intercept packages of

marijuana); *United States v. Valle,* 538 F.3d 341, 344–345 (5th Cir. 2008)

(Immigration and Customs Enforcement inducing alien to pay him to remove

alien's criminal charges); *United States v. Veras de los Santos*, No. 05-3387, 184 F.

App'x 245, 255 (3rd Cir. 2006) (Customs official's acceptance of money in

exchange for allowing alien to pass through the customs process); *cf. United*

*States v. Fernandez*, Nos. 19-15044, 19-1516, 2022 U.S. App. LEXIS 23350

(11th Cir. 2022) (the term "official duty" "ordinarily encompasses a public

officials' job responsibilities as dictated by governing statutes, rules, and

---

[4] As to the scope of an FBI Special Agent's job responsibilities, *see* 18
U.S.C. § 351; 18 U.S.C. § 3052; 18 U.S.C. § 3107; 28 U.S.C. § 533; 28 U.S.C. §
540; 28 U.S.C. § 540A0; 28 U.S.C. § 540B; 28 C.F.R § 0.85.

regulations") (unpublished). As the Second Circuit explained in *Alfisi*, 308 F.3d at 151 n.3, prosecution under section 201(b)(1)(A) (which uses the same terminology as section 201(b)(2)(A)) "seems most appropriate in the case of bribes regarding decisions involving the exercise of judgment or discretion[,] … while use of (C) would be most appropriate in the case of bribes to induce actions that directly violate a specific duty, such as a prison guard's duty to prevent the smuggling of contraband."

The government's bribery theory in this case strayed far afield from Paitsel's official decisions and duties as an FBI Special Agent and focused instead on his general ethical obligations as a DOJ employee. The indictment set that stage, alleging that "DOJ regulations governed the behavior of DOJ employees, including PAITSEL, and set forth [Paitsel's] lawful and official duties." App'x at 72 (Doc. 18 at 13). It specifically charged that those regulations defined his "lawful and official duties" as an FBI Special Agent and charged that, by accepting payments in exchange for conduct that violated those ethical standards, Paitsel had committed bribery and conspiracy to commit bribery. *See* App'x at 72 (Doc. 18 at 13).

Because section 201(b)(2)(C) applies to bribes relating to an "official duty" rather than to ethical obligations, Paitsel objected in limine to the admission into evidence of the federal regulations cited in the indictment and

the FBI Ethics and Integrity Program Policy Directive. Doc. 119. In response to Paitsel's motion, the government doubled down on its theory that an ethical obligation equated to an "official duty," arguing, "Certain pertinent *lawful and official duties* for FBI special agents like Defendant Paitsel are set forth in the Code of Federal Regulations, as incorporated into the FBI Ethics and Integrity Program Policy Directive …, including the provisions to which Defendant Paitsel objects[.]" Doc. 133 at 3 (emphasis added). Ultimately, the district court overruled Paitsel's motion, ruling that the existence of the policies were relevant because they made "it 'more or less probable' that [he] had a lawful duty to maintain the confidentiality of the documents for which Bailey allegedly paid [him]." App'x at 110 (Doc. 216 at 12). The court acknowledged, though, that the ethics regulations did not define either Paitsel's "official duty" or his "lawful duty," saying, "To the extent Defendant is concerned that the jury may consider these exhibits as 'lawful duties' when they are not as a matter of law, the Court will address that issue when it instructs the jury." App'x at 110 (Doc. 216 at 12).

That ruling led to the court's admission at trial of 78 pages of Title 5, Part 2635, of the Code of Federal Regulations, which contains broad Standards of Ethical Conduct for Employees of the Executive Branch, in addition to five pages of "supplemental" ethical standards set forth in Title 5,

Part 3801, and eight pages of the FBI Ethics and Integrity Program Policy Directive and Policy Guide. *See* App'x at 436–47 (Doc. 250 at 87–88); *see* Gov't Exs. 7A, 7B, 8. The government had a witness read aloud some of the standards, including those regarding the use of public office for private gain and the use of government property for other than authorized purposes. App'x at 448–49 (Doc. 250 at 99–100); App'x at 453 (Doc. 250 at 104). These ethical standards—including the excessively vague regulation requiring employees to "put forth honest effort in the performance of their duties"—said nothing about Paitsel's decision-making responsibilities or actions as an FBI Special Agent. *See* App'x at 438 (Doc. 250 at 88); Gov't Ex. 7A at 1 (5 C.F.R. § 2635.101(b)(5)).

And the district court never issued its previously promised limiting instruction. The admission of these standards into evidence, especially without an instruction explaining that they did not define Paitsel's official duties, misled the jury into believing that it could convict Paitsel of bribery under section 201(b)(2)(C) if Bailey's remuneration influenced Paitsel to behave unethically, regardless of whether any of Bailey's payments corrupted Paitsel's official decision-making or actions as an FBI Special agent. The bribery statute should not be read so broadly as to criminalize every ethical breach. As the Supreme Court said in *Sun-Diamond Growers*, 526 U.S. at 412:

> [T]he numerous … regulations and statutes littering [the] field of [public officials' acceptance of gifts] demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions. Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.

Indeed, even though some unethical acts undoubtedly would also violate an official duty—for example, accepting money in exchange for discontinuing an FBI investigation—many of the standards that the district court admitted into evidence here were far too vague to define Paitsel's "official duties" as an FBI Special Agent for purposes of the bribery statute. "[I]n order to be relevant in a criminal prosecution[, ethical] standards must prescribe duties and modes of conduct as opposed to broad ethical and moral precepts." *United States v. Morlang*, 531 F.2d 183, 192 (4th Cir. 1975). That's because, "to comply with Fifth Amendment due process, the defendant must have fair notice of what conduct is forbidden. This 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendant's actions were criminal." *United States v. Safavian*, 528 F.3d 957, 964–65 (D.C. Cir. 2008) (cleaned up).

Consequently, in *Safavian*, this Court reversed a defendant's convictions for violating 18 U.S.C. § 1001(a)(1) under circumstances similar to the circumstances here. The defendant in that case—the General Services

Administration Chief of Staff—went on an overseas golf trip with a high-profile lobbyist. Before doing so, he asked the GSA's General Counsel whether the lobbyist could pay his airfare for the trip. In his inquiry, however, the defendant failed to disclose that he had been providing information to the lobbyist regarding two GSA-controlled properties in which the lobbyist was interested. Based on the information that the defendant did provide, the General Counsel advised him that he could accept the airfare. During a later ethics inquiry, the defendant again failed to mention the lobbyist's interest in the two GSA properties. He later wrote a letter to a Senate Committee, again failing to mention the lobbyist's interest in the properties.

A federal grand jury charged the defendant with, among other things, "falsify[ing], conceal[ing] and cover[ing] up by a trick, scheme, and device material facts" in violation of 18 U.S.C. § 1001(a)(1). *Id.* at 963. At trial, the jury found that he had violated section 1001(a)(1) when he had "concealed his assistance to [the lobbyist] in official GSA-related activities" and again when he had falsely stated in a letter to the Senate Committee that the lobbyist did not have GSA business. *Id.*

This Court reversed those convictions. *Id.* at 964–65. The Court observed that that "there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1), yet the government failed to

identify a legal disclosure duty except by reference to vague standards of conduct for government employees." *Id.* at 964 (footnote omitted). Some of those "vague standards" are the same standards on which the government relied in this case, including that "[e]mployees shall put forth honest effort in the performance of their duties," 5 C.F.R. § 2635.101(b)(5), and "[e]mployees shall not use public office for private gain," 5 C.F.R. § 2635.101(b)(7). *See id.* at 964–65. The Court ruled that the relationship of these ethics regulations to the defendant's "duty" under section 1001(a)(1) not to conceal material facts in any matter within the executive branch of the government was "tenuous at best." *Id.* at 964. The Court said: "If an employee violates a standard of conduct, he may be subject to disciplinary action. [5 C.F.R.] § 2635.106(a). We cannot see how this translates into criminal liability under 18 U.S.C. § 1001(a)(1) whenever someone seeking ethical advice or being interviewed by a GSA investigator omits 'relevant information.'" *Id.* at 964. The Court explained: "The ethical principles give no indication of the particular facts or information an executive employee must disclose. Nor do they suggest that they have any bearing on conduct during a GSA investigation or a request for an ethics opinion." *Id.* at 965. For this reason and others, the Court concluded that the defendants' convictions could not stand. *Id.* at 965.

Under section 201(b)(2)(C), the requirement that the government prove that the defendant violated a particular "official duty" is explicit in the statute itself. *Safavian* establishes that that duty cannot be based on vague ethics regulations that do not fairly warn government employees of conduct that may result in criminal liability. Section 2635.101(b)(5), which directs government employees not to use government property for "other than an authorized purpose" is such a regulation, especially considering that 28 C.F.R. § 45.4 expressly authorizes government employees to use "Government office and library equipment and facilities" for "[p]ersonal use that involve[s] only negligible expense (such as electricity, ink, small amounts of paper, and ordinary wear and tear)." Yet the government relied on that regulation as the primary one establishing Paitsel's "official duties" while, for good measure, presenting the jury with the entire panoply of governing ethics regulations to peruse. This evidence led the jury to believe that it could find Paitsel guilty of bribery based only on a determination that he had violated ethical duties that were too vague to place him on notice that he might be held criminally liable for their violation.

And the record establishes without a doubt that the jury must have based its verdict on that evidence, rather than evidence showing that Paitsel had accepted Bailey's payments (or had agreed to accept Bailey's payments) to

44

corrupt his official decision-making or actions. The only evidence relating to

Paitsel's actual official job responsibilities came from Paitsel's FBI supervisor,

Temitayo Aderoba, who testified:

> He was a special agent assigned to my unit. His core responsibility
> was to liaison with the workforce, to include professional staff and
> special agents, to help us gather what we call the business
> requirements to, one, either enhance current capabilities of
> systems that we currently have or, two, to build — help us build
> capabilities that is required, that is current[ly] a gap within the
> workforce to enhance the job.

App'x at 445 (Doc. 250 at 96). No evidence showed that Bailey had paid

Paitsel to influence him in fulfilling those duties, much less that Paitsel had

accepted money from Bailey as an incentive to do any act relating to those

duties. Indeed, his supervisor testified that Paitsel performed his duties well

and successfully and evaluated his job performance as "excellent." App'x at

462–73 (Doc. 250 at 113–24).

Given the dearth of evidence that Paitsel had violated any of his actual

official duties, the government told the jury during closing argument that it

could convict Paitsel of bribery if it found he had violated the ethics regulations

that had been the focus of the government's case. Conflating the term "lawful

duty" with the term "official duty," even though the bribery statute uses each

of those terms in different subsections, and assuming that a "lawful duty"

includes a duty to comply with federal ethics regulations, the government told

the jury that that the final element that the government had to prove in order to convict Paitsel of bribery was that "Paitsel had a *lawful duty* as an FBI and DOJ employee not to provide sensitive personal information to Brian Bailey." App'x at 1025 (Doc. 308 at 67) (emphasis added). The government said that this element was "an easy one" because two federal regulations "spelled out" "exactly how FBI agents are supposed to behave, how they are supposed to use their time, how they are supposed to use government resources." App'x at 1025–26 (Doc. 308 at 67–68).

Thus, even though the indictment charged Paitsel with "official duty" bribery under section 201(b)(2)(C), the government told the jury that Paitsel's violation of any ethical duty, including the duty not to misuse his time, automatically qualified as a duty violation that merited his conviction of bribery. That was wrong. And, given the lack of evidence showing that Paitsel had accepted payment "in exchange for particular decisions or actions taken or to be taken … in [his] official capacity," *see Muntain*, 610 F.2d at 968, it led the jury to convict Paitsel based on conduct that did not constitute bribery.

For this reason in addition to the reason set forth above, Paitsel is entitled to relief from his bribery conviction.

**II.    The District Court's Structural Error in the Bribery Instruction Jury Led the Jury to Convict Paitsel Based on Conduct that did not Constitute Bribery or Conspiracy to Commit Bribery.**

If any doubt remains that the jury improperly based its verdict on Paitsel's violation of an ethical standard without determining whether that standard defined an "official duty," that doubt can be put to rest by an examination of the jury instructions on Counts 3 (conspiracy), 4 (bribery as to Bailey under section 201(b)(1)(C)), and 5 (bribery as to Paitsel under section 201(b)(2)(C)). Under section 201(b)(2)(C), the jury could find Paitsel guilty of bribery only if the evidence showed that he corruptly accepted or agreed to accept something of value in return for "being induced to do or omit to do any act in violation of [his] official duty[.]" *See* 18 U.S.C. § 201(b)(2)(C). The federal conspiracy statute criminalizes conspiring to commit that offense. *See* 18 U.S.C. § 371.

Because section 201 does not define the term "official duty," what constituted Paitsel's "official duty" was a factual one for the jury. *See Fernandez*, 2022 U.S. App. LEXIS 23350 at *14 (citing *United States v. Project on Gov't Oversight*, 616 F.3d 544, 562 (D.C. Cir. 2010)); *cf. United States v. Luna*, 649 F.3d 91, 99–100 (1st Cir. 2011). Under the Due Process Clause, Paitsel could not be convicted of bribery unless the government proved beyond a

reasonable doubt both the existence of such an official duty and all other facts constituting that crime. *See United States v. Johnson*, 718 F.2d 1317, 1320 (5th Cir. 1983) (*en banc*) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). And no matter how conclusive the evidence may have been on the "official duty" element, the district court could not direct a guilty verdict on it. *See Rose v. Clark*, 478 U.S. 570, 577–78 (1986); *Connecticut v. Johnson*, 460 U.S. 73, 83 (1983); *United States v. DiRico,* 78 F.3d 732, 735 (1st Cir 1996) (quoting *United States v. Gaudin*, 515 U.S. 506, 522–23 (1995)); *United States v. Ragsdale*, 438 F.2d 21, 27 (5th Cir. 1971).

Yet, in this case, the district court instructed the jury that the elements of bribery as charged in Count 5 were:

> First, that Mr. Paitsel directly or indirectly demanded, sought, received, accepted, and/or agreed to receive and accept something of value.

> Second, Mr. Paitsel was then a public official by virtue of his being employed as a supervisory special agent for the Federal Bureau of Investigation.

> Third, that Mr. Paitsel did so corruptly in return for being induced to violate *his official duty not to use government resources for nonofficial business.*

*See* App'x at 1146 (Doc. 309 at 69) (emphasis added). The court thus instructed the jury that Paitsel had an "official duty not to use government resources for

48

nonofficial business" and thereby "relieved the prosecution of its duty of proving, beyond a reasonable doubt, [Paitsel's] guilt of every element of the offense charged." *See United States v. Bass*, 784 F.2d 1282, 1284–85 (5th Cir. 1986). "Because the government is never entitled to a directed verdict in a criminal jury trial," *United States v. Burton*, 737 F.2d 439, 441 (5th Cir. 1984), this instruction violated the Due Process clause and rendered Paitsel's bribery conviction unconstitutional, *see DiRico,* 78 F.3d at 735; *United States v. Daily*, 921 F.2d 994, 1005 (10th Cir. 1990). Moreover, this error constitutes a structural defect that requires reversal of Paitsel's convictions because, "where a jury has not rendered a verdict that addresses every essential element of the charged offense, and therefore has not rendered a verdict on the crime charged, the question of whether the same verdict would have been rendered absent the constitutional error is meaningless." *See DiRico*, 78 F.3d at 737–38; *accord Sullivan v. Louisiana*, 508 U.S. 275, 280–81 (1993); *Rose,* 478 U.S. at 577–78; *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988); *United States v. Rockwell*, 781 F.2d 985, 990 (3d Cir. 1986).

Review of the jury instructions in their entirety highlights exactly why the Count 5 instruction resulted in structural error. Count 4 charged Bailey with bribing Paitsel in violation of section 201(b)(1)(C), while Count 5 charged

Paitsel with accepting those bribes in violation of section 201(b)(2)(C). *See* App'x at 81–82 (Doc. 18 at 22–23). Section 201(b)(1)(C) requires the government to prove that the defendant intended to influence a public official to do or to omit to do something in violation of his "lawful duty," *see United States v. Lasanta*, 978 F.2d 1300, 1309 (2d Cir. 1992), while section 201(b)(2)(C) requires the government to prove that the defendant accepted a bribe in return for being induced to violate an "official duty," *see Valle*, 538 F.3d at 349.

Just as those subsections define those crimes differently, the district court's instructions on those counts explained those charges differently. Regarding Count 4, the Court explained that Bailey had been charged with offering or paying a bribe to Paitsel. The court said that, to find Bailey guilty of that crime, the jury would have to find, among other things,

> that Mr. Paitsel had a lawful duty not to use government resources for nonofficial business and/or to keep confidential the information for which Mr. Bailey allegedly gave, offered, or promised something of value to Mr. Paitsel.

App'x at 1144 (Doc. 309 at 67). The court then explained,

> *For the purposes of this instruction*, a lawful duty is any statutory, regulatory, or official duty imposed upon Mr. Paitsel either orally or in writing by virtue of and specific to his position as the supervisory special agent for the Federal Bureau of Investigation.

App'x at 1144 (Doc. 309 at 67) (emphasis added). And, importantly, the Court

continued, "*As for Count 4*, the existence of a *lawful duty* may be proven through direct or circumstantial evidence." App'x at 68 (Doc. 309 at 68) (emphasis added). Thus, as the Court repeatedly emphasized, *for purposes of Count 4*, the question of whether Paitsel had a particular "lawful duty" was a question for the jury to resolve.

The Court's instruction on Count 5, which pertained to Paitsel, was very different. For that count, the Court told the jury that, to find Paitsel guilty, it would have to find:

> First, that Mr. Paitsel directly or indirectly demanded, sought, received, accepted, and/or agreed to receive and accept something of value.

> Second, that Mr. Paitsel was then a public official by virtue of his being employed as a supervisory special agent for the Federal Bureau of Investigation.

> *Third, that Mr. Paitsel did so corruptly in return for being induced to violate his official duty not to use government resources for nonofficial business.*

App'x at 1146 (Doc. 309 at 69) (emphasis added). As to the elements of the crime, that was it. In stark contrast to the instruction on Count 4, which charged the jury with determining what constituted Paitsel's "lawful duty," this instruction told the jury exactly what constituted Paitsel's "official duty"— that is, "not to use government resources for nonofficial business." The instruction, therefore, improperly directed a verdict on a crucial element of the

offense.

The district court was on notice of this error because Bailey objected to the government's proposed jury instructions on the ground that a factual dispute existed as to what constituted the "official duties" of the public official at the DHAC whom he had supposedly bribed, and he requested the court to revise the instructions on both of the substantive bribery counts—including the count relating to his supposed bribery of Paitsel—to remove any reference to a particular "official duty." Doc. 196 at 4–5. And the government agreed that "the question of whether an official or lawful duty exists is a factual question for the jury." *See* Doc. 202 at 1–2, 4. Because the district court expressly stated that the court would assume that all defense objections and motions made during the course of the trial would be adopted by the codefendant, Doc. 137 at 41, Bailey's objection sufficiently preserved the objection for both Bailey and Paitsel. *See United States v. Lefkowitz*, 284 F.2d 310, 313 n.1 (2d Cir. 1960) (codefendant's objection preserved for appeal for an unobjecting defendant an alleged instructional error); *United States v. Bagby*, 451 F.2d 920, 927 (9th Cir. 1971) (same).

But even if it didn't, the error in the instruction constituted a plain, structural error that was so intrinsically harmful that reversal is required. *See Neder v. United States*, 527 U.S. 1, 7 (1999) (recognizing that some errors are "so

intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome"). Under the plain-error standard of review, reversal is required if the court (1) committed an error, (2) the error was "obvious," (3) the error "affec[ts] substantial rights," and (4) the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732–36 (1993). The first two prongs are met when, as here, a jury instruction directs a verdict. *See Payne v. Stansberry*, 760 F.3d 10, 17 (2014) (discussing "critical distinction" between jury instruction that directs a verdict (as here) and jury instruction containing a confusing legal standard).

The third and fourth prongs are satisfied too because, as the Supreme Court explained in *Sullivan*, 508 U.S. at 278, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt," and denial of the right to a jury verdict of guilt beyond a reasonable doubt is a "structural error," that "def[ies] analysis by 'harmless-error' standards," *id*. at 281–82. Both the Supreme Court and this Court "have recognized that the logic of *Sullivan* applies to plain error analysis." *Payne*, 760 F.3d at 12 (citing *United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993); *Arthur v. United States*, 986 A.2d 398, 413 (D.C. 2009)). Therefore, when, as here, a jury instruction

improperly lessens the government's burden of proof, the defendant satisfies his burden on plain-error review to show prejudice and harm to the fairness and integrity of the judicial proceeding. *See Payne*, 760 F.3d at 12 ("A finding that the instructional error at Payne's trial was 'structural' would, under the logic of *Sullivan v. Louisiana*, go a significant way towards establishing the last two prongs of the plain error inquiry"); *Merlos*, 8 F.3d at 50–51; *Barrows v. United States*, 15 A.3d 673 (D.C. 2011) (a structural error is "likely to have an effect on the fairness, integrity or public reputation of judicial proceedings").

In any event, the prejudice here was patent. By removing from the jury's determination the critical disputed element of what constituted Paitsel's "official duty," the district court ensured that the jury would convict Paitsel based on his violation of an ethical obligation, regardless of whether that obligation was tethered to an official duty. That violated Paitsel's Sixth Amendment right to a jury verdict on every element.

This would be true even if other instructions had suggested that the question of what constituted Paitsel's "lawful duty" remained open. Given that this Court should presume that the jury followed the court's instructions, *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010), and because the district court explicitly instructed the jury that Paitsel had an "official duty not to use government resources for non-official business," in is inconceivable that

the jury would have cobbled together pieces of other instructions to reach the conclusion that that the question of what constituted Paitsel's "official duty" remained open for their determination. *See Baker v. United States*, 324 A.2d 194, 196–97 (D.C. 1974) (rejecting government's argument that jury instruction that directed a verdict was harmless when considered in light of the instructions as a whole).

This error—whether structural, plain, or otherwise—infected Paitsel's conspiracy conviction too. The conspiracy instruction explained that the jury could convict Paitsel if the government proved:

> First, that between February 28, 2017 and June 1, 2018, *there was an agreement to commit bribery*.

> Second, that Mr. Paitsel intentionally joined in that agreement, and

> Third, that one of the people involved in the conspiracy engaged in one overt act described in the indictment.

App'x at 1140 (Doc. 309 at 63) (emphasis added). Because that instruction did not define the term "bribery," the jury would have had to have looked to a bribery instruction to determine the elements of that offense. Although the indictment alleged that the conspiracy had two objects—bribery in violation of section 201(b)(1)(C) and bribery in violation of section 201(b)(2)(C)—it is inconceivable that, in determining the elements of bribery as to Paitsel, the jury

would have looked only to the bribery elements set forth in the instructions on Count 4, which related only to Bailey. And, even if the jury relied on the instructions as to both Count 4 and Count 5, it still would have been left with the understanding that the court had already determined that Paitsel had an official duty not to use government resources for nonofficial business. The conspiracy instruction, therefore, resulted in the same structural error that the bribery instruction caused.

Therefore, Paitsel is entitled to relief from both his bribery conviction and his conspiracy conviction.

## Conclusion

For these reasons, Paitsel respectfully requests that this Court reverse his bribery and conspiracy convictions.

Respectfully submitted,

/s/ *Linda Julin McNamara*
Linda Julin McNamara
Fla. Bar. No. 7148887
email: linda@federal-lawyer.com
Oberheiden P.C.
610 East Zack Street, Suite 110-4079
Tampa, FL 33602
Telephone: (813)784-7921
Fax: (972) 559-3365

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.　　This document complies with the type-volume limit of Fed. R.

App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by

Fed. R. App. P. 32(f), this document contains 12943 words.

2.　　This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface

using Microsoft Word for Microsoft 365 in 14 point Calisto font.

*s/ Linda Julin McNamara*

LINDA JULIN MCNAMARA
Oberheiden P.C.
Attorney for David Paitsel
July 17, 2024

## Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was sent by CM/ECF on July 17, 2024, to:

KATHERINE MARY KELLY, ASSISTANT U.S. ATTORNEY AND

CHRISELLEN REBECCA KOLB, ASSISTANT U.S. ATTORNEY

*Counsel for the United States*

*s/ Linda Julin McNamara*

LINDA JULIN MCNAMARA

Oberheiden P.C.
